J-S69009-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA,

　　　　　　　　　　　Appellee

　　　　　　v.

JOSIAH WARREN,

　　　　　　　　　　　Appellant

IN THE SUPERIOR COURT
OF
PENNSYLVANIA

No. 929 MDA 2018

Appeal from the Judgment of Sentence Entered April 25, 2018
In the Court of Common Pleas of Franklin County
Criminal Division at No(s): CP-28-CR-0001526-2016

BEFORE:  BENDER, P.J.E., LAZARUS, J., and MURRAY, J.

MEMORANDUM BY BENDER, P.J.E.:　　　　　　**FILED DECEMBER 24, 2018**

Appellant, Josiah Warren, appeals from the judgment of sentence of 36 months' intermediate punishment and a concurrent, aggregate term of 24 months' probation, imposed after he was convicted by a jury of endangering the welfare of children (EWOC), corruption of minors (COM), and furnishing liquor to minors (FLM).  After careful review, we affirm.

The trial court summarized the evidence presented at Appellant's trial, as follows:

> The Commonwealth called K.P., the step-daughter of [Appellant] and daughter of [co-defendant] Kendra Warren [(hereinafter, "Warren")]….  K.P. was eighteen years old at the time of trial, having been born in December of 1999.  At the time of trial, K.P. was living with her biological father and finishing her senior year in high school.
>
> In July of 2016, K.P. lived with her aunt, Katrina Johnson. Prior to that, she lived with [Warren], [Appellant], and younger

brother in Mercersburg, Franklin County. K.P. described times when she became upset and [Warren's] and [Appellant's] response was to give her alcohol and marijuana. In response to the Commonwealth's question as to how that would come about, she testified, "Kind of just like, we would go out in the garage and smoke together."

With respect to the alcohol, K.P. testified, "They would kind of just have it out and then it would be offered … to me." Sometimes [Warren] would offer it to her; sometimes [Appellant]. She described, "[t]he first time, like, I tried it[,] [it] was a sip of wine and then later on it was more liquor. Like Crown Royal, which looked like a crown." The bottle of Crown Royal was in the house on top of the refrigerator. It was offered to her when she was upset. K.P. described the tasted of Crown Royal as "bitter and gross." Sometimes they gave her a shot glass to drink out of; other times it was "mixed with Pepsi or something like that." When asked to describe how the alcohol made her feel, K.P. explained, "I just felt really tired and usually like after maybe 10 minutes I would just go to bed." She was about 15 when [Warren and Appellant] first gave her Crown Royal. She was given alcohol approximately once a week until she told her aunt about what was happening in July [of] 2016.

K.P. explained to the jury that when she was upset[, Warren] and [Appellant] sometimes gave her marijuana to smoke. Usually, she smoked in the garage. The marijuana was kept in a little box nailed onto the shed above the tools. When asked what she smoked the marijuana out of, K.P. explained, "Usually, like a small thing. I don't remember the color or anything. But a bowl we would smoke out of or roll up like a paper joint." Smoking marijuana became "a normal thing for [her] to do at that time." K.P. confirmed that the three of them[, Warren, Appellant, and K.P.,] smoked marijuana together. K.P. smoked marijuana three to four times a week from the time she was fifteen years old until she told her aunt about it in July [of] 2016.

K.P. also described situations where she would suffer physical consequences for her actions. She testified that she was smacked in the face or "gut punched" in the stomach by [Appellant]. K.P. explained that [Appellant] put his hands on her, "when we got in a really huge argument; maybe every two weeks. I don't really want to say exact time frame, because I can't say like every two weeks. It was when we got in a really huge argument."

- 2 -

On one occasion, K.P. sought medical treatment at Urgent Care. K.P. testified, "A couple days after he hit my head off the ground I went to Urgent Care and there was a bump. But I wasn't truthful with the doctor and actually didn't tell them what happened." The incident resulting in the trip to Urgent Care occurred after K.P. had her phone and Facebook privileges taken away. [Appellant] went through her history and accused K.P. of being on Facebook when she was not permitted. K.P. denied it; [Appellant] grabbed her hair. She tried to pull away but he slowly put her on the floor and banged her head on the ground (three times) and told K.P., "Get your head out of your ass." [Warren] asked him to stop, which he refused. K.P. described having, "a pretty bad migraine for like two days after that, but other than that it was just a small bump on [her] head."

The time [Appellant] slapped her face, K.P. had a red mark. She covered it up with her hair and didn't tell anyone. Her friend at school noticed, but she told her friend that she didn't want her to say anything.

K.P. told the jury that [Appellant] put a deadbolt on her bedroom door in response to an incident with her boyfriend because he thought she would run away. She recalls the deadbolt being only locked once; rather, it was used as more of a threat. When it was locked, she had to knock on the door to use the restroom. K.P. did acknowledge on cross-examination that she had threatened to run away and kill herself on prior occasions; however, not on the night the deadbolt was locked.

On cross-examination K.P. agreed that she had made a prior report to Franklin County Children and Youth [Services] [(FCCYS)]; however, she never reported the alcohol or marijuana use. She also acknowledged that her relationship with [Warren and Appellant] declined after an incident with her boyfriend where [he] gave her "bad drugs" that made her sick. When challenged by counsel for [Appellant] about not wanting to live under [Warren's and Appellant's] rules, K.P. responded, "I wasn't allowed to do anything, really, so it was - I always had rules. I could have left when I was 13, but I didn't. It wasn't, like, the rules, it was kind of just. I felt this - I don't know how to describe it. Enclosed from everything." She could have told other family members about it, but she didn't. She denied counsel's accusation that she wanted to get out of [Warren's and Appellant's] house because of their rules, no matter the cost. K.P. finally disclosed to her Aunt Katrina [Johnson (hereinafter, "Johnson")] what was

happening to make sure nothing would happen to her little brother.

Michelle Jones ([hereinafter,] "Jones"), a caseworker with [FCCYS] testified that her agency received a referral in June 2016 regarding [Warren] and [Appellant]. K.P. was the child subject of the referral. Jones met with K.P. and [Warren]. [Warren] admitted that she "and another person" gave K.P. marijuana and alcohol, specifically Crown Royal. K.P. was given the marijuana "three or four times" to calm her down. [Warren] also admitted that she "and another person" locked K.P. in her room using a deadbolt once. Jones observed the deadbolt on K.P.'s bedroom door.

Jones also spoke to … [Appellant] by phone. He denied giving K.P. anything, but did admit that there was a deadbolt on K.P.'s bedroom door.

[] Johnson, K.P.'s maternal aunt, testified that in July of 2016, K.P. came to live in her home. K.P. had been babysitting Johnson's children a couple of days a week over the summer break. K.P. told Johnson and her husband about what was happening at her home. K.P. initially told Johnson that she was given marijuana one time - she did not initially disclose that it was happening three or four times per week. After the initial disclosure by K.P., which Johnson related to Officer McCorristan of the Mercersburg Police Department, Johnson and K.P. had further discussions during which K.P. disclosed that the drug use occurred "a lot more frequently."

Johnson called [FCCYS]. [Johnson] talked to [Warren] about K.P.'s allegations on many (10 or 15) occasions. [Warren] told Johnson that she ["]and another person["] gave K.P. marijuana and alcohol to calm her down. They used the marijuana together. [Warren's] attitude was that "every parent gives their kid alcohol or drugs at some point. That it was normal." [Warren] also admitted to Johnson that she "and another person" locked K.P. in her bedroom with a deadbolt on one occasion.

Daniel McQuade testified that he has known the Warrens for about 10 years. He has visited the Warren[s'] home. McQuade has never witnessed any argument between … [Appellant] and K.P. However, about two summers []prior to the trial[,] he was at the Warren[s'] home and observed K.P. "storming up the steps..." upset as the result of a disagreement with [Appellant]. K.P. angrily said, "I will do whatever it takes to get out of this house by the summer."

- 4 -

[Appellant] testified. He has been with [Warren] for eighteen years; they have been married for ten. He[] [has] been in K.P.'s life as her father figure since she was three months old. [Appellant] described K.P. as, "beyond stressed, dealing with teenaged stuff." [Appellant] denied ever physically abusing K.P. He also denied giving K.P. alcohol except when she asked to taste wine on New Year's Eve. He denied giving K.P. Crown Royal or shots, although he did acknowledge that there is Crown Royal in his home.

With respect to marijuana, [Appellant] admitted giving the child marijuana on one occasion because, "[s]he was beyond stressed" about her boyfriend, attempting to commit suicide, taking pills, threatening to kill herself and trying to run away. [Appellant] explained that K.P. asked him and [Warren] if she could use marijuana. At first, they said no. But after days of no sleep over worry as to whether she'll be dead or alive, they gave her some so they could sleep. [Appellant] reported that it was only one occasion, in June of 2016. "I set it on the counter and she picked it up." He did not smoke marijuana with her. He described the marijuana as being in a box mounted to the wall "in the garage out of the reach of everybody but me because I was the only one who could reach it."

[Appellant] also testified that the deadbolt on K.P's bedroom door was only locked once, the first time it was put on, to make sure it worked. She just thought it was locked, but never actually checked. With respect to the entire case, [Appellant] repeatedly claimed, "It's been blown way out of proportion from the very beginning. I've said it's been blown out of proportion."

Kendra Warren testified that she is K.P.'s mother. [Warren] testified regarding changes in K.P.'s behavior since the time she started high school. K.P. was lashing out and angry all the time. After [FCCYS] became involved, upon agreement, K.P. went to live with [Warren's] sister.

[Warren] denied giving K.P. Crown Royal; however, she repeated the same story as [Appellant] regarding the New Year's Eve wine K.P. asked to taste. [Warren] admitted giving K.P. marijuana one time because she was very upset and she asked for it. [Warren] denied telling Johnson it was more than once. They were in the middle of looking for a counselor for K.P., but between her work schedule and their medical insurance, it was hard to find a counselor.

> [Warren] also mirrored [Appellant's] testimony in that she denied ever locking K.P. in her room. "It had been locked. What I meant by saying that was that we showed her that it was locked when she was standing in the hall with us. She was never physically locked in her room." [Warren] also admitted sending K.P. a text message asking K.P. to drop the charges.

Trial Court Opinion, 7/17/18, at 2-10 (citations to the record and footnotes omitted).

At the conclusion of Appellant's trial, he was convicted of the above-stated offenses. He was sentenced on April 25, 2018, to a term of 36 months' intermediate punishment for his EWOC conviction, which included 30 days' of incarceration and 120 days' of electronic home monitoring. Appellant received terms of 12 and 24 months' probation for his FLM and COM convictions, respectively, which were imposed to run concurrently with his intermediate punishment sentence.

Appellant filed a timely notice of appeal, and he also timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) statement. The court filed a responsive opinion on July 17, 2018. Herein, Appellant presents two questions for our review:

1. Did the trial court abuse its discretion by denying [Appellant's] request for a continuance?

2. Did the trial court abuse its discretion by admitting the co-defendant's inculpatory statements regarding her and [Appellant], the substance of which was provided the day before trial and [Appellant] was not informed that the inculpatory statements from [the] co-defendant involved him until trial?

Appellant's Brief at 8.

Appellant's two issues both involve the Commonwealth's late disclosure of inculpatory statements made by his co-defendant, Warren, to two Commonwealth witnesses - Johnson (Warren's sister) and Jones (the FCCYS case worker). As stated *supra*, Johnson claimed she had 10 to 15 conversations with Warren as this case proceeded, during which Warren admitted that she and Appellant had given K.P. marijuana and alcohol. **See** N.T. Trial, 2/14/18, at 85. Warren told Johnson that they gave K.P. marijuana to calm her down, and that Warren and Appellant had smoked the drug with K.P. **Id.** at 86. Warren further admitted to Johnson that on one occasion, she and Appellant locked K.P. in her bedroom using a deadbolt. **Id.** at 87.[1]

In regard to the Commonwealth's disclosure of inculpatory statements by Warren that were ostensibly included in an FCCYS report drafted by Jones, the record is less clear. That report was not admitted into evidence during Jones' testimony, and Appellant does not elaborate on what specific inculpatory statements were allegedly set forth in that report. However, consistent with Jones' trial testimony, we presume that her report detailed Warren's admissions that she and Appellant gave K.P. alcohol and marijuana, and locked K.P. in her room with a deadbolt on one occasion. **See id.** at 75-76.

_____

[1] At trial, the Commonwealth did not mention Appellant when questioning Johnson about Warren's inculpatory statements; instead, Appellant's name was replaced with the term, "another person," to avoid any issue under **Bruton v. United States**, 391 U.S. 123 (1968) (holding that a defendant's Confrontation Clause rights are violated if his non-testifying co-defendant's confession naming him as a participant is introduced at their joint trial).

It is undisputed that the Commonwealth did not learn of the inculpatory statements that Warren made to Johnson, or discover that Jones had drafted an FCCYS report containing additional inculpatory statements, until the evening before Appellant's trial began. Appellant concedes that the prosecutor informed his attorney "within minutes of discovering this information." Appellant's Brief at 13. On the morning of trial, the parties and the court met in chambers and had an off-the-record discussion about how to handle Warren's newly-discovered, inculpatory statements. Once the trial commenced, the court and parties then summarized that discussion, as follows:

> THE COURT: We also discussed the Commonwealth's recent disclosure of defendant, Kendra Warren's, statements to her sister pursuant to Pennsylvania Rule of Criminal Procedure 573. [The prosecutor,] Attorney Carr[,] indicated that he became aware of these statements[,] that were described in the nature of ongoing [conversations] and were revealed during … witness preparation. So[,] there was discussion regarding the nature of the statements, the substance of the statements. There were objections from both counsel[,] which the court overruled based on the Commonwealth's provision of the information at the time we had the conference in chambers.
>
> Do you want to put anything else on the record with respect to that, Attorney Rahauser [counsel for co-[Appellant] Warren, or] Attorney Taccino [Appellant's counsel]?
>
> MRS. RAHAUSER: Yes, Your Honor. My specific objection was because we were on notice that there [were] inculpatory statements, but not what the substance of that was.
>
> THE COURT: And that was provided to you yesterday, but Attorney Carr provided the substance of the inculpatory statement this morning.
>
> MRS. RAHAUSER: This morning, yes.

THE COURT: Attorney Taccino?

MR. TACCINO: Same.

THE COURT: Anything else you want to put on the record with respect to that Attorney Carr?

MR. CARR: Just, Your Honor, I notified both counsel via e-mail within minutes after prepping Ms. Johnson about the inculpatory statements and I did make them aware of the substance of them. They are not -- I don't believe they should be anything, given what the affidavit and incident report causes -- [or] should cause any great surprise.

THE COURT: All right.

MR. CARR: And I will note that Katrina Johnson had been listed in the incident report since the beginning of this case and was listed as a witness at pre-trial conference.  And I had discussed with both counsel, I believe, that my understanding was there was ongoing conversations between Katrina Johnson and Kendra Warren, I just simply didn't know the nature of those statements until prepping her yesterday.

THE COURT: Okay.  And the [c]ourt will not preclude the statements.

***

THE COURT: All right.  So that led us to additional discussion regarding cross[-]examination of Ms. Jones with respect to the summary or synopsis of her interview with Kendra Warren as reported in the police report and inquiry then into the existence or lack thereof or whether it was in the [possession] of the Commonwealth, [that being] Ms. Jones' original [FCCYS] report. As a result of that discussion, the [c]ourt order[ed] disclosure of the [FCCYS] report to counsel for the Warrens so that they had the opportunity to review that prior to Ms. Jones' testimony.

The Commonwealth did not have that document in their possession but it was provided today.  As a result of that disclosure today, there was a continuance request from both [Appellant] and Warren based on the statement from Ms. Johnson that we discussed just a moment ago and the [FCCYS] report that the [c]ourt ordered disclosed.  And the continuance requests were denied because[,] although perhaps the particular statements

were not in the hands of defense counsel, they are consistent with prior information provided to counsel.

Attorney Rahauser, I'll let you put what you want on the record in order to preserve your objection.

MRS. RAHAUSER: Nothing additional, thank you.

THE COURT: Attorney Taccino, I want to give you the opportunity to place any additional information on the record to preserve your objection.

MR. TACCINO: I believe your recitation of what has occurred and the objections by at least myself on behalf of [Appellant] are accurate.

THE COURT: All right.

N.T. Trial at 67-68, 70-71.

Now, in Appellant's first issue on appeal, he contends that the trial court

erred by denying his request for a continuance.

It is well settled that the decision to grant or deny a request for a continuance is within the sound discretion of the trial court. ***Commonwealth v. Pries***, 861 A.2d 951, 953 (Pa. Super. 2004), *appeal denied,* 584 Pa. 693, 882 A.2d 478 (2005). Further a trial court's decision to deny a request for a continuance

> will be reversed only upon a showing of an abuse of discretion. ***Commonwealth v. Ross***, 465 Pa. 421, 422 n. 2, 350 A.2d 836, 837 n.2 (1976). As we have consistently stated, an abuse of discretion is not merely an error judgment. ***Mielcuszny v. Rosol***, 317 Pa. 91, 93–94, 176 A. 236, 237 (1934). Rather, discretion is abused when "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record…." ***Commonwealth v. Chambers***, 546 Pa. 370, 387, 685 A.2d 96, 104 (1996) (quoting ***Mielcuszny***, 317 Pa. at 93–94, 176 A. at 236).

***Commonwealth v. Randolph***, 582 Pa. 576, 873 A.2d 1277, 1281 (2005) (quoting ***Commonwealth v. McAleer***, 561 Pa. 129, 748 A.2d 670, 673 (2000)).

- 10 -

***Commonwealth v. Prysock***, 972 A.2d 539, 541 (Pa. Super. 2009).

Appellant claims that, here, the court abused its discretion by denying him a continuance where the Commonwealth did not disclose, until the evening before trial, that Warren had made inculpatory statements to Johnson.[2] Appellant contends that a continuance would have allowed him "additional time to seek to impeach [Johnson] based upon [her] prior statements and/or prepare additional cross-examination." Appellant's Brief at 16. Appellant also insists that "[t]here would have been no hardship or prejudice to the Commonwealth to continue the matter to the next trial term, pick a new jury[,] and re-subpoena the witnesses." ***Id.*** at 17-18.

Appellant's argument does not convince us that the trial court abused its discretion by denying his continuance request. Notably, Appellant does not specifically explain how his cross-examination of Johnson would have differed had he been given more time to prepare. Our review of the record also reveals that Appellant requested - and was granted - five continuance requests between December 15, 2016, and August 25, 2017. Given this record, we cannot conclude that the court erred by refusing Appellant's sixth request for

---

[2] Within this first issue, Appellant makes no argument that a continuance was warranted because of the late disclosure of Jones' FCCYS report.

- 11 -

additional time, where Appellant does not specify how that extra time would have changed his cross-examination of Johnson.[3]

In Appellant's second issue, he contends that the court should have excluded Warren's inculpatory statements as a sanction to the Commonwealth for violating its discovery obligations under the Pennsylvania Rules of Criminal Procedure. Specifically, Appellant relies on Pa.R.Crim.P. 573(B)(1)(b), which requires the Commonwealth to turn over an inculpatory statement "that is in the possession or control of the attorney for the Commonwealth."

Appellant concedes that nothing in the record refutes the Commonwealth's claim that it was not aware of (and, thus, it did not possess) Warren's inculpatory statements until the eve of trial, and that it immediately turned over that evidence to Appellant. Appellant's Brief at 20. However, Appellant "request[s] a reasonable extension of the law in this instance as to the meaning of 'control' for purposes of Rule 573." *Id.* Essentially, he asks us to add to Rule 573 a requirement that the Commonwealth must also turn over any inculpatory statements that it could discover with reasonable diligence. *Id.* at 21. For instance, Appellant claims that the Commonwealth could have discovered and disclosed Jones' FCCYS report earlier, as the affidavit of probable cause indicated that Warren had made inculpatory

---

[3] We also note that Appellant has not demonstrated that he was prejudiced by the court's refusal to grant him a continuance. Appellant took the stand and admitted that he gave K.P. alcohol and marijuana, and that he put a deadbolt on K.P.'s door. Accordingly, we fail to see how Appellant was prejudiced by his alleged inability to fully cross-examine Johnson about Warren's similar, out-of-court admissions.

statements to Jones. Therefore, Appellant asks us find that the Commonwealth violated Rule 573 as he proposes we amend it, and that the trial court erred by not precluding the admission of Warren's inculpatory statements as a sanction for that violation.

Appellant's argument is completely unconvincing. Initially, this Court does not have the power to add a reasonable diligence requirement to Rule 573. The Pennsylvania Constitution provides that the Pennsylvania Supreme Court "shall have the power to prescribe general rules governing practice, procedure, and the conduct of all courts." Pa. Const. Art. V, § 10. "This power to establish rules of procedure rests **exclusively**" with the Supreme Court. **Commonwealth v. Liston**, 977 A.2d 1089, 1093 (Pa. 2009) (emphasis added). Here, Appellant concedes that the Commonwealth did not possess Warren's inculpatory statements until the eve of trial, at which point it immediately informed defense counsel of that evidence. Thus, Rule 573 was not violated, and the court did not err in admitting Warren's inculpatory statements.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/24/2018